**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NANCY HEBERT ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. WGC-07-2142** |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Plaintiff Nancy Hebert ("Ms. Hebert") brought this action against Defendant, the United States of America ("United States") alleging negligent conduct, battery and undue mental anguish by employees of the United States, specifically, personnel at the Baltimore Veterans Administration Medical Center. The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment. *See* Document No. 10. Pending before the Court and ready for resolution is Defendant's Motion for Summary Judgment (Document No. 34). Plaintiff filed an Opposition (Document No. 42) and Defendant a Reply (Document No. 46). No hearing is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2008).

## BACKGROUND

Plaintiff Nancy Hebert is a veteran of the United States Army. While serving on active duty Ms. Hebert was a combat medic for many years. Subsequently she attended and completed a two year nursing program becoming a licensed practical nurse ("LPN"). Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex. 1 (Hebert Dep. 12:1 - 21). During her military

1

career Ms. Hebert served in Iraq in 1991 during the first Gulf War.  *Id.*, Ex. 1 (Hebert Dep. 19:21 - 20:1).  As a veteran Ms. Hebert is entitled to receive medical care and services from the Veterans Administration ("VA").

Ms. Hebert was first diagnosed with Crohn's disease[1] in 1994 by a doctor in Louisiana. *Id.*, Ex. 1 (Hebert Dep. 30:5 - 8), Ex. 2 at 63.[2]  Subsequently another doctor told Ms. Hebert that she does not have Crohn's disease.  Sometime later another doctor diagnosed her with Crohn's disease.  *Id.*, Ex. 1 (Hebert Dep. 30:5 - 31:12).  It was a flare of this condition which caused Ms. Hebert to visit the Baltimore Veterans Affairs Medical Center ("BVAMC").

On July 19, 2004 Ms. Hebert arrived at BVAMC's Emergency Care Services complaining that she felt she was having a Crohn's flare.  She had not taken her Crohn's medication in six months.  Ms. Hebert also reported having severe abdominal pain, bloating, and diarrhea the past two days.  *Id.*, Ex. 2 at 46.  While in the emergency department Ms. Hebert vomited several times.  She was started on a hydrocortisone intravenous ("IV") and a dilaudid[3] IV.  Ms. Hebert was admitted to the hospital.  *Id.*, Ex. 2 at 18.

During her initial visit to the emergency department or sometime after Ms. Hebert's admission, medical staff inquired about any allergies.  Ms. Hebert identified morphine and

---

[1] "[A] form of inflammatory bowel disease (IBD), which involves ongoing (chronic) inflammation of the gastrointestinal tract.  Crohn's-related inflammation usually affects the intestines, but may occur anywhere from the mouth to the end of the rectum (anus)."  Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000249.htm (last visited October 23, 2009).

[2] At the bottom right hand corner of each page of Ms. Hebert's medical records a number is handwritten encased in a circle.  For ease of identification the Court will cite this number encased in a circle as the page number. Additionally, there are several duplicates of individual pages from Ms. Hebert's medical records.  The Court will cite to the first page number containing pertinent information.

[3] Is the brand name for Hydromorphone, "a strong analgesic (painkiller), to relieve [one's] pain."  Medline Plus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601148.html (last visited October 23, 2009).

morphine derivatives.  *Id.*, Ex. 2 at 37.  Another portion of Ms. Hebert's medical records for July

19-20, 2004 lists motrin and morphine as medications which cause an allergic reaction in Ms.

Hebert.  *Id.*, Ex. 2 at 17.  A third portion of the  medical records indicates Ms. Hebert is allergic

to morphine, codeine, aspirin and ibuprofen.  *Id.*, Ex. 2 at 142.  And a fourth portion of the

medical records of July 19-20, 2004 indicates Ms. Hebert is allergic to only compazine.  *Id.*, Ex.

2 at 12, 39, 44.

According to Ms. Hebert, sometime during this hospitalization, the medical staff sought

assurance that Ms. Hebert could eat and drink before discharging her.  A nurse therefore gave

Ms. Hebert a cup of ice chips.  Ms. Hebert laid back in the bed and began eating the cup of ice

chips.  At some point while eating Ms. Hebert felt an ice chip become lodged in her throat and

began hacking.  She continued to cough in an attempt to loosen the object and force it out of her

throat.  Eventually Ms. Hebert did not feel anything caught in her throat although her throat was

still very scratchy.  *Id.*, Ex. 1 (Hebert Dep. 34:3 - 14).

According to Ms. Hebert she reported her difficulty to a nurse who opined Ms. Hebert

likely just bruised the back of her throat.  The nurse advised Ms. Hebert that the bruise in the

back of the throat would go away in a day or two.  Later a doctor visited Ms. Hebert.  He

inquired about her persistent coughing.  She explained what happened when eating ice chips.

Using a penlight the doctor visually examined Ms. Hebert's mouth and throat.  The doctor

noticed no redness or anything else unusual.  *Id.*, Ex. 1 (Hebert Dep. 34:15 - 35:19).

The medical records do not document any alleged complaint about an ice chip stuck in

Ms. Hebert's throat or her coughing or hacking during Ms. Hebert's admission to BVAMC

between July 19-20, 2004.  Neither the nurse who supposedly advised Ms. Hebert that she likely

bruised her throat nor the doctor who allegedly examined Ms. Hebert's mouth and throat with a penlight apparently recorded their interaction with Ms. Hebert. *See id.*, Ex. 2. Ms. Hebert was discharged on July 20, 2004 at approximately 1742 hours. *Id.*, Ex. 2 at 13, 58; *see id.*, Ex. 1 (Hebert Dep. 37:11 - 15); Ex. 10 at 160 ("She was d/c'ed to home yesterday evening.").

According to Ms. Hebert, after being discharged and upon returning home, she continued to cough. She could not lie flat. Ms. Hebert, in an effort to clear her throat, was throwing up phlegm and other "guck." She became scared when she could not breathe. The following day, July 21, 2004, Ms. Hebert's friend drove Ms. Hebert back to the BVAMC.

A portion of the medical records indicates Ms. Hebert choked on an ice chip while in the hospital *prior to* her July 20, 2004 discharge. The Medical Admission History and Physical, Emergency Care Visit of July 21, 2004 states in pertinent part,

> 40 yo female with h/o of Crohns Dz x 10 yrs . . .discharged last night after admission for crohn's flare. . . . She returns back to the ER again today as she continued to have RUQ[4] abdominal pain, nausea/vomiting/inability to tolerate PO[5], and diarrhea.
>
> She states [] she also started to develop SOB[6] after choking on some ice chips while in the hospital prior to discharge. She was told that she had irritated her throat. However, at home, she continued to have to gasp for air and continues to feel that something is stuck in her airpipe.

*Id.*, Ex. 10 at 157.

Ms. Hebert was discharged the early evening of July 20, 2004 at approximately 1742

---

[4] Right upper quadrant.

[5] Per Os (i.e. Oral - by mouth). mediLexicon, http://www.medilexicon.com/medicalabbreviations.php (last visited October 23, 2009).

[6] Shortness of breath.

hours.  A portion of Ms. Hebert's medical records documents the ice chip incident occurred

during lunch on July 20, 2004.  "Unclear source of this SOB that started after she choked on ice

chips yesterday during lunch."  *Id.*, Ex. 10 at 154.

Other portions of the medical record list the ice chip incident as occurring *after* Ms.

Hebert's discharge on July 20, 2004.  On VA Form 10-1000, Discharge Summary, the following

is reported,

> Since her discharge, she reports having difficulty breathing, feeling
> as if something is caught in her throat.  She was unable to sleep due
> to this, and felt as if she could not breathe at all when lying flat.

*Id.*, Ex. 10 at 175.  A few pages later this same Discharge Summary revealed,

> The night following discharge [July 20, 2004], the patient had trouble
> breathing, felt as if something was stuck in her throat, had to sleep
> sitting up, and experienced worsening abdominal pain and vomiting.
> At this point she returned to the ED for admission on 7/21/04.

*Id.*, Ex. 10 at 172.

The triage note from July 21, 2004 states,

> Pt. disch. from 3A last night.  Return today with c/o SOB, started last
> night when she choked on ice she was chewing & started to cough.
> Unable to rest last night because coughing & SOB.  "Feels like
> something is stuck in my throat."  She also c/o Abd. pain 10/10 thinks
> from Crohne's [sic] flare up.

*Id.*, Ex. 10 at 165.

Also, as recorded by the BT Emergency Care Visit, Ms. Hebert's chief complaints are

shortness of breath ("SOB") and abdominal pain.  With regard to the former, the medical records

document the following,

> Pt reports she choked on a piece of ice and had a vigorous coughing
> fit to expel object and since then her SOB has become worse.  Pt is
> now unable to l[ie] flat d/t SOB and has to sit upright.

*Id.*, Ex. 10 at 154.

Elsewhere, in the Admission History and Physical, it is reported,

> Ever since her Discharge, she reports having difficulty breathing, as if something is caught in her throat.  She was unable to sleep due to this, felt as if she could not breathe at all when lying flat.

*Id.*, Ex. 10 at 160.

Ms. Hebert was examined in the emergency department.  Upon examination Ms. Hebert is described as "sitting in ER bed, appears uncomfortable, pt taking gasping breaths, though she is able to talk in complete sentences[,] [i]s becoming SOB." *Id.*, Ex. 10 at 159.  Ms. Hebert was admitted to the hospital.

Ms. Hebert was admitted, not only because of issues with her throat and shortness of breath, but also due to complaints of abdominal pain, which Ms. Hebert attributed to a Crohn's flare.  Ms. Hebert rated the level of pain as 10 out of 10.  *Id.*, Ex. 10 at 165.  A doctor, Bradley J. Robottom, M.D.,  decided morphine should be administered to Ms. Hebert via an IV line.  *See id.*, Ex. 10 at 157-58.  The nurse complied with the doctor's instructions.  After the morphine IV line was started, Ms. Hebert began feeling a burning sensation and voiced her reaction to the nurse.  The nurse responded the IV line is morphine.  Ms. Hebert became very excited informing the nurse that she (Ms. Hebert) is highly allergic to morphine.  Ms. Hebert requested benadryl.  Meanwhile, Ms. Hebert began breaking out in hives.  *Id.*, Ex. 1 (Hebert Dep. 60:21 - 62:4).  A few minutes later a benadryl 25 mg IV was administered.  Shortly thereafter Ms. Hebert's allergic reaction began to subside.  *Id.*, Ex. 10 at 152.  The pain medication was changed from morphine to dilaudid which Ms. Hebert tolerated well.  *Id.*  This incident occurred on the night of July 21, 2004.

Sometime on July 22, 2004 an Ears, Nose and Throat ("ENT") doctor examined Ms. Hebert and noticed a foreign body in her throat.  Ms. Hebert was escorted to the ENT Clinic for a closer examination and to have a superior medical official examine her.  *See id.*, Ex. 10 at 126 ("Pt alert oriented X 3 having a little difficulty breathing, ENT to evaluate Pt, decided to take Pt. to his office. . . .").  "[W]e examined the patient and noted to have some mild inspiratory stridor. We performed flexible fiberoptic laryngoscopy and limited tracheostomy revealing a particle of plastic in the patient's subglottis.[7]"  *Id.*, Ex. 10 at 103.   These ENT specialists determined surgery was urgently needed to remove the foreign body from Ms. Hebert.  The surgery was successful, without any complications, and the foreign body was removed from Ms. Hebert's subglottis.  *See id.*, Ex. 10 at 102-03, 129.

The following day Ms. Hebert's throat was much better.  However she still was experiencing abdominal pain due to Crohn's.  *Id.*, Ex. 10 at 124.  Despite this ongoing condition Ms. Hebert wanted to be discharged.

> After speaking with patient, she wishes to leave the hospital today. She still has significant abdominal pain requiring narcotics, and she is still nauseous enough to ask for IV antiemetics.  We advised her it would be wise to stay in the hospital, advance her diet slowly and have a colonoscopy on Monday, but she is against this idea.

*Id.*, Ex. 10 at 119.  Against medical advice, Ms. Hebert left the BVAMC.  *Id.*, Ex. 10 at 70-71.

A month later, August 23, 2004, Ms. Hebert returned to the emergency department at BVAMC complaining of "10 out of 10" abdominal pain with nausea and vomiting.  Ms. Hebert reported the pain is very similar to past Crohn's flares.  *Id.*, Ex. 13 at 305.  During this

---

[7] "The lower part of the larynx just below the vocal cords down to the top of the trachea, which takes air to the lungs."  MedicineNet.com http://www.medterms.com/script/main/art.asp?articlekey=5579 (last visited October 23, 2009).

emergency department visit a doctor directed the insertion of an nasogastric (NG) tube[8] because some of Ms. Hebert's vomit included blood.  Ms. Hebert initially refused.  She was ultimately convinced.  A nurse then arrived to insert the NG tube through Ms. Hebert's right nostril.  After approximately two inches were inserted Ms. Hebert screamed in pain.  The nurse removed the NG tube with blood dripping from the right nostril.  *Id.*, Ex. 13 at 277, 281, 286, 288, 293.

After Ms. Hebert's admission the medical staff found no evidence of a gastrointestinal ("GI") bleed.  Her nausea and vomiting resolved and the volume of her packed red blood cells (hematocrit[9]) was above 25.  Because Ms. Hebert felt well, she wanted to leave the hospital to attend a funeral in Louisiana.  Since her hematocrit was above 25, there was no active GI bleed and her nausea and vomiting had resolved, BVAMC discharged Ms. Hebert on August 27, 2004. *Id.*, Ex. 13 at 301.

Three days later, on the night of August 30, 2004, Ms. Hebert returned to BVAMC's emergency department with a major complaint of rectal bleeding since the previous day and three bloody stools that day.  *Id.*, Ex. 14 at 403.  Multiple tests – including esophagogastroduodenoscopy ("EDG")[10] and colonoscopy[11] – were performed to determine the

---

[8] A procedure called a gastric suction is performed to empty the contents of the stomach.  A gastric suction is performed as follows:  "[a] tube is inserted through the nose or mouth, down the food pipe (esophagus), and into the stomach.  Sometimes [one] may get a numbing medicine to reduce irritation and gaging as the tube is being inserted."  Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003882.htm (last visited October 23, 2009).

[9] "[A] blood test that measures the percentage of red blood cells found in whole blood.  This measurement depends on the number of red blood cells and the size of red blood cells."  Medline Plus, http://www.nlm.nih/gov/medlineplus/ency/article/003646.htm (last visited October 23, 2009).

[10] "[A]n examination of the lining of the esophagus, stomach, and upper duodenum with a small camera (flexible endoscope) which is inserted down the throat."  Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm (last visited October 23, 2009).

[11] "[A]n internal examination of the colon (large intestine), using an instrument called a colonscope."  Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003886.htm (last visited October 23, 2009).

source of Ms. Hebert's bleeding.  During this hospitalization Ms. Hebert received three blood

transfusions.  *See id.*, Ex. 14 at 1, 308, 316, 332, 357, 362.  She was discharged on September 3,

2004 with a plan to follow-up with the GI Clinic for an outpatient capsule endoscopy[12] (a virtual

endoscopy) imaging.  *Id.*, Ex. 14 at 412.

  The night of her discharge Ms. Hebert vomited twice (no blood), had a high fever and

chills as well as experienced a severe headache.  Symptoms associated with the headache

included stiffness of the neck, blurry vision and photophobia.  *Id.*, Ex. 15 at 128.  Ms. Hebert

returned to the BVAMC's emergency department the following day, September 4, 2004, and

reported her symptoms.  Ms. Hebert also disclosed that a right femoral TLC (triple lumen

catheter) was placed during her most recent hospitalization and was removed on September 3,

2004.  Ms. Hebert complained of pain in the right groin area where the line had been placed.  *Id.*

The Medical and Admission History and Physical also documented Ms. Hebert's complaint

about the site of the IV line.  "Patient had R[ight] femoral central line for 2-3 days during her

[previous] admission and c/o pain at former site of line."  *Id.*, Ex. 15 at 98.  Ms. Hebert was

admitted to the hospital.  At the time of her admission, Dr. Angela M. Kopack noted "concern

for line sepsis as patient had femoral TLC that was removed yesterday.  CXR clear and no

symptoms of pneumonia."  *Id.*, Ex. 15 at 93.  Dr. Katherine A. Grundmann, Emergency Care

Services Attending Physician, physically examined Ms. Hebert.  "PE without obv[ious] source of

infection.  Of note r[ight] femoral area withuot [sic] evidence of infection, and abdominal exam

nontender."  *Id.*, Ex. 15 at 108.

---

[12] "[A] technology that uses a swallowed video capsule to take photographs of the inside of the esophagus, stomach, and small intestine."  MedicineNet.com http://www.medicinenet.com/capsule_endoscopy/article.htm (last visited October 23, 2009).

During the course of her hospitalization Ms. Hebert continued to experience pain where the femoral line had been.  For example, on September 5, 2004 at 1337 hours it is reported that Ms. Hebert has "worsening R groin pain where had femoral line."  *Id.*, Ex. 15 at 89.  Less than an hour later at 1420 hours, during a physical examination by Dr. Conrad May, he noted "abdomen with tenderness in the right groin area, near the catheter site[.]"  *Id.*, Ex. 15 at 85.  After the physical examination and a review of blood tests, Dr. May documented his impressions including that "[i]t is possible that the patient had line infection following placement of a femoral vein catheter during the previous admission."  *Id.*, Ex. 15 at 84.

Dr. May physically examined Ms. Hebert the following day, September 6, 2004, at 1328 hours.  Ms. Hebert reported right groin pain which now also includes the right hip.  *Id.*, Ex. 15 at 78.  Later that day, at 1600 hours, as recorded on the Medical Daily Progress Note, Ms. Hebert complained of an extremely painful right groin.  *Id.*, Ex. 15 at 75.

Dr. May checked Ms. Hebert the following day, September 7, 2004, and recorded the following attending note,

> The patient reports having continued pain of the right groin.  CT scan of the abdomen reveals the presence of irregularities in the region of the right ileo-psoas consistent with the patient's symptoms.  She is now having diarrhea.
>
>       *             *             *
>
> The fever and leukocytosis have responded well to empiric antibiotic treatment.  The diarrhea may be secondary to antibiotic use.  The soft tissue infection in the region of the right groin may have been introduced by use of the triple lumen catheter.

*Id.*, Ex. 15 at 70.

On September 8, 2004 at 1321 hours Dr. Angela M. Kopack reported, "Patient has been

receiving dilaudid for R groin pain.  Was not tolerating PO originally and is allergic to morphine,

motrin, asa and codeine. Plan is to transition to PO pain meds as tolerated." *Id.*, Ex. 15 at 62.

Later than night, at 2246 hours, LPN Dharmista N. Patel documented the following in a nursing

note.  "[P]t. c/o pain in rt groin.  pt vomited mod amt watery.  med given as ordered.  tlc in rt ij in

place.  dressing dry and intact." *Id.*, Ex. 15 at 59.

The following day, September 9, 2004, Dr. May documented the following information

in an Attending Note,

> The patient reports feeling somewhat improved.  She has persistent
> diarrhea.
>
> *            *                    *
>
> She is being treated for c. difficile diarrhea, and infection related to
> placement of a right femoral catheter.  The fever and leukocytosis
> have resolved, and she is stable for discharge to home.

*Id.*, Ex. 15 at 50.

Ms. Hebert was discharged the evening of September 9, 2004.  She reported still experiencing

pain at the right groin though there has been some improvement.  *Id.*, Ex. 15 at 49.  Dr. Regina

B. Osih, Infections Disease Fellow, reported under assessment/plan, "No cultures are positive so

far, rt groin is inflamed per CT but no drainable collections were identified.  We recommend to

treat the patient with 7 more days of gatifloxacin since we do not have a definite culture."  *Id.*,

Ex. 15 at 49.  Ms. Hebert was instructed to follow-up with her primary care physician if there are

any signs or symptoms of worsening infection.  Three follow-up appointments were scheduled

for Ms. Hebert:  (a) with the Primary Care Clinic on September 13, 2004 at 1330 hours, (b) with

the Women's Health Clinic on September 13, 2004 at 1500 hours, and (c) with Mammography

on September 28, 2004 at 1500 hours.  *Id.*, Ex. 15 at 124.

Ms. Hebert was a "no-show" for her appointment with the Primary Care Clinic on September 13, 2004. The Women's Health Clinic canceled her appointment for that same date. The appointment with the Primary Care Clinic was rescheduled to September 23, 2004 which the clinic subsequently canceled. Ms. Hebert failed to show for her appointment with the GI Clinic on September 24, 2004. Ms. Hebert's appointment with the Women's Health Clinic was rescheduled to September 27, 2004 which Ms. Hebert subsequently canceled. Ms. Hebert sought emergency care from BVAMC on October 11, 2004. *Id.*, Ex. 7 at 1.

At the emergency department Ms. Hebert reported nausea for over the past week, an inability to keep anything down, instances of vomiting, almost passing out at the movies and awaking the previous night drenched in sweat with a temperature of 103.8. *Id.*, Ex. 9 at 268. Ms. Hebert was admitted to BVAMC on October 11, 2004 and remained hospitalized for four days. During her hospitalization multiple tests were performed and she was referred both to the GI Clinic and the Psychiatry Clinic. Among the series of test administered to determine if Ms. Hebert has a GI infection were Hepatitis B, Hepatitis C, C. differential and fecal leukocytes. At the time of discharge the Hepatitis B, C. differential and fecal leukocytes were negative. The Hepatitis C result was still pending. *Id.*, Ex. 9 at 262.

The GI consultation issued the following assessment:

> Based on the testing we have, the patient does not have crohns' disease. The cause of her abdominal pain is idiopathic and may be from viral gastroenteritis, IBS, choledocolithiasis, or pain-medication seeking behavior. The most likely explanation for her elevated liver enzymes is the bacteremia. However, given the abdominal pain, stones in the bile duct is a possibility, but CT of abdomen did not show this.

*Id.*, Ex. 9 at 263.

At the time of Ms. Hebert's discharge on October 15, 2004, a follow-up appointment with the Primary Care Clinic was scheduled for Ms. Hebert on October 18, 2004.  The discharging physician added a note urging, "[o]n follow-up appointments, please check Hep C results. . . ."  *Id.*, Ex. 9 at 260.

An appointment with the Women's Health Clinic, scheduled for October 15, 2004 at 0800 hours, was canceled by the clinic likely due to Ms. Hebert's hospitalization.  Ms. Hebert canceled the October 18, 2004 appointment with the Primary Care Clinic.  This clinic canceled Ms. Hebert's appointments for October 26, 2004 and November 5, 2004.  On November 8, 2004 Ms. Hebert sought emergency care from BVAMC.  The next day, November 9, 2004, Ms. Hebert failed to show for an appointment with the Primary Care Clinic.  *Id.*, Ex. 7 at 1.  On this same date the medical records list, under acute or chronic history (a computerized problem list), Hepatitis C.  *Id.*, Ex. 8 at 509.

Ms. Hebert canceled a CAT Scan appointment scheduled for December 3, 2004.  The Primary Care Clinic canceled her December 6, 2004 appointment.  Ms. Hebert canceled her December 13, 2004 appointment with the Primary Care Clinic, and the clinic canceled Ms. Hebert's appointment scheduled for December 27, 2004.  *Id.*, Ex. 7 at 1.

Ms. Hebert was seen by the Primary Care Clinic, on an unscheduled basis, on February 7, 2005.  Ms. Hebert reported having blood in stools last night and pain in her gut awoke her that morning.  During this appointment JoAnne C. Ward, Nurse Practitioner, noted Ms. Hebert was unaware of the label of Hepatitis C.  Nurse Ward further noted these results were indeterminate. *Id.*, Ex. 8 at 508.  In summarizing Ms. Hebert's medical history Nurse Ward noted, for hepatitis, history of indeterminate Hepatitis C.  *Id.*  Nurse Ward suggested Ms. Hebert be seen by the

emergency department regarding the bloody stools and abdominal pain.  Ms. Hebert declined.

Nurse Ward provided a laboratory slip to Ms. Hebert, who returned 15 minutes later reporting

the laboratory was closed.  Ms. Hebert stated she would return in the morning.  *Id.*, Ex. 8 at 507.

After verbalizing her understanding of instructions, Ms. Hebert left the clinic.

Four days later, on February 11, 2005, Nurse Ward called to speak with Ms. Hebert, who

was not home, and left a message for Ms. Hebert to call her.  *Id.*, Ex. 8 at 511.  Nurse Ward then

wrote a "letter notification note" to Ms. Hebert stating, "[p]lease be sure to have your lab done

so that further evaluation and treatment can be given."  *Id.*, Ex. 8 at 513.  Nurse Ward advised

Ms. Hebert that her next appointment is scheduled for March 15, 2005.

Ms. Hebert sought emergency care from BVAMC on March 11 and March 14, 2005.  On

June 13, 2005 Ms. Hebert failed to show for an appointment with the Primary Care Clinic.  *Id.*,

Ex. 7 at 1.

## ADMINISTRATIVE HISTORY

On March 23, 2006 Ms. Hebert submitted to the Veterans Administration Regional

Council[13] Standard Form ("SF") 95, *Claim for Damage, Injury or Death*.  Ms. Hebert sought

$500,000.00 for personal injury.  Attached to the SF 95 is a two page letter from Olivia D.

Cammack, an attorney retained by Ms. Hebert.  Ms. Cammack's letter to the Veterans

Administration Regional Counsel states in pertinent part,

> Ms. Hebert has had multiple admissions to the Baltimore
> Veterans hospital for exacerbation of her Crohn's disease,
> gastrointestinal bleeding, Foreign Body of throat removal, and follow
> up appointments to the clinics.

---

[13] Should be "Veterans Administration Regional *Counsel*."  *See* Def.'s Mot. Summ. J. ("Def.'s Mem."), Ex.
16 at 2 (stamp acknowledging receipt of claim).

14

In July of 2004, Ms. Hebert was admitted for the first exacerbation of her Crohn's disease. Prior to discharge Ms. Hebert was eating ice chips and choked. She called for the nurse who came and looked in her throat and told her she probably bruised her wind pipe. Yet there is no mention of this in the discharge by nursing or in the daily shift report. The physician who discharged her does not indicate this. Additionally, the discharge summary prepared by the physician contains no indication of this. When she returned the next day the emergency room staff notes this compliant yet all of the appropriate testing was not done to rule this out. It appears that this was being ignored. An ENT consultation was not done until 1 1/2 days after admission.

Prior to the ENT consultation, Ms. Hebert received Morphine by a nurse who failed to identify the patient prior to administering the medication. When Ms. Hebert asked what the nurse had given she responded Morphine. Ms. Hebert informed the nurse of her allergy. There have been conflicting listings of Ms. Hebert's allergies in her medical records. Ms. Hebert was still wearing an allergy bracelet from her recent admission which listed morphine. This nurse did not follow industry standard patient safety procedures, which would be to identify the patient, inform the patient of medication and verify allergies prior to giving a medication.

A resident from ENT, after a brief exam, rushed Ms. Hebert to the ENT Clinic to further evaluate his brief finding. The nursing staff was not informed of the patient being taken from the unit. Ms. Hebert was walked with a known foreign body in her throat to the ENT clinic. This put Ms. Hebert at great risk for dislodgement and airway blockage and respiratory failure.

*                    *                    *

The incident of Hepatitis C is concerning. It was appropriate to test Ms. Hebert for this due to the elevated liver enzymes. There is never any discussion with Ms. Hebert about this. This is a reportable disease to the CDC (Communicable Disease Center [sic]).[14] This is a voluntary report, but most agencies do send the information. This is also something that you would want a patient to know about due to transmission to others. Yet Ms. Hebert did not find out until March of 2005, when the test was done in October

---

[14] Should be "Center for Disease Control."

2004.  This disease has treatment options which should have been discussed with Ms. Hebert.   However, this diagnosis was never discussed with Ms. Hebert by any of the doctors who were attending her at that time.

An investigation of Ms. Hebert's medical care provided by the VA Medical Center at Baltimore has resulted in claims against the Veterans' Administration for negligence, mental anguish, and pain and suffering.  Ms. Hebert is seeking damages for: delay in treatment and improper evaluation of a foreign body in her throat; failure to verify medication allergies and administration of a medication to which she was allergic; improper evaluation and treatment of Crohn's disease; failure to address Ms. Hebert's complaints; failure to inform the nurse's unit when Ms. Hebert was taken to the ENT clinic; and, failure to inform Ms. Hebert of positive results of a Hepatitis C test.

*Id.*, Ex. 16 at 3-4.

More than six months have elapsed since Ms. Hebert filed her administrative claim on March 23, 2006 without a final disposition of her claim.  On August 13, 2007 Ms. Hebert elected to commence action against the United States by filing a lawsuit pursuant to 28 U.S.C. § 2675(a).  Her four count Complaint alleges (a) negligence – delay in treatment and proper evaluation of foreign object, (b) battery, (c) negligence – failure to inform Plaintiff of positive hepatitis c results and (d) undue mental anguish – failure of staff to inform or address complaints.

## JURISDICTION & VENUE

This case falls under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 - 2680.  This Court has exclusive jurisdiction over this civil action.  28 U.S.C. § 1346(b).  Venue is proper in this judicial district because the events giving rise to this action occurred in Baltimore, Maryland and at the time of the events and when she initiated this lawsuit, Ms. Hebert was residing in Maryland.  28 U.S.C. §§ 1391(e), 1402(b).

Under the FTCA the United States is liable to the same extent as a private individual under similar circumstances except the United States shall not be liable for punitive damages or pre-judgment interest.  28 U.S.C. § 2674; *Bankert by Bankert v. United States*, 937 F. Supp 1169, 1180 (D. Md. 1996).  This Court must apply Maryland law since the allegedly negligent or wrongful act or omission occurred in Maryland.  28 U.S.C. § 1346(b) (emphasis added) ("[F]or injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*."); 28 U.S.C. § 2674.

Ms. Hebert is not entitled to a trial by jury for her claim against the United States. "[A]ny action against the United States under section 1346 shall be tried by the court without a jury[.]"  28 U.S.C. § 2402.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394

(4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as

to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts

alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.

1985).  The court may not weigh evidence or make credibility determinations.  *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A party who bears the burden of

proof on a particular claim must factually support each element of his or her claim.  "[A]

complete failure of proof concerning an essential element . . . necessarily renders all other facts

immaterial."  *Celotex Corp.*, 477 U.S. at 323.  However, on those issues on which the

nonmoving party will have the burden of proof, it is that party's responsibility to confront the

motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at

256.

"'A mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex*

*Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42

F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959

(1968)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party.  If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## ANALYSIS

A.      *Gross Negligence versus Medical Malpractice*

Before addressing Ms. Hebert's individual causes of action, the Court must first resolve a dispute between the parties concerning which claims are applicable to the facts of this case.  The United States' position is Ms. Hebert's negligence claims are, in fact, medical malpractice claims, that expert testimony is required for medical malpractice claims and that Ms. Hebert failed to identify an expert to provide testimony concerning medical malpractice by physicians or surgeons.  Contrarily, Ms. Hebert asserts both physicians and nurses were negligent in treating her, that she has retained an expert regarding the negligence of nurses, and that the physicians' negligence was so gross that expert testimony is not warranted pursuant to *John Hopkins Hosp. v. Genda*, 255 Md. 616, 623, 258 A.2d 595, 599 (1969).

Under Maryland law "[o]ne is grossly negligent or acts wantonly and willfully 'only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *McCoy v. Hatmaker*, 135 Md. App. 693, 706, 763 A.2d 1233, 1240 (2000) (quoting *Tatum v. Gigliotti*, 80 Md. App. 559, 568 (1989) (quoting *Romanesk v. Rose*, 248 Md. 423, 237 A.2d 12 (1968)).  There are no facts, as summarized in the *Background* section, suggesting that *any* of the doctors or nurses at BVAMC intentionally injured or where utterly indifferent to Ms. Hebert's medical conditions.  For instance, Ms. Hebert alleges the medical staff at BVAMC was negligent in the delay in treatment and proper evaluation of a foreign object in her throat.  Ms. Hebert does not allege that medical staff completely ignored her or refused to examine her when she complained about a choking sensation after chewing some ice chips before her discharge on July 20, 2004.  In her Complaint Ms. Hebert admits both a

19

nurse and a doctor looked in her mouth when she reported the choking sensation.  *See* Compl. ¶¶

16-17.  Extraordinary or outrageous conduct, equating to a reckless disregard for human life, not

mere recklessness alone, constitutes gross negligence.  *McCoy*, 135 Md. App. at 706, 763 A.2d

at 1240.  No such evidence of reckless disregard for human life exists in this case.

In the absence of gross negligence Ms. Hebert would need expert testimony to support

her claims of "negligence" against the physicians at BVAMC.  "In actions for malpractice

against physicians and surgeons, 'the main issue of the defendant's use of suitable professional

skill is generally a topic calling for expert testimony only. . . ."  *Genda*, 255 Md. at 623, 258

A.2d at 599 (quoting *Wigmore on Evidence* (2d ed.) § 2090)).  An allegation of negligence

against medical professionals in regards to the giving or the failure to give health care, is an

assertion of medical malpractice.  *See Cannon v. McKen*, 296 Md. 27, 34, 459 A.2d 196, 200

(1983); MPJI-Cv 19:1, cmt. E.

B.      *Negligence: Delay in treatment and proper evaluation of foreign object*

A presumption exists that a doctor performs his medical duties with requisite skill and

care.  *Nolan v. Dillon*, 261 Md. 516, 534, 276 A.2d 36, 46 (1971) (citing *State, Use of Janney v.

Housekeeper*, 70 Md. 161, 16 A. 382 (1889); *Fink v. Steele*, 166 Md. 354, 171 A. 49 (1934);

*McCless v. Cohen*, 158 Md. 60, 148 A. 124 (1930)).  To overcome such a presumption a

plaintiff, such as Ms. Hebert, bears the burden of proof.  Ms. Hebert must prove (a) the

applicable standard of care, (b) a breach of this standard of care, and (c) a causal relationship

between the breach of the standard of care and injuries she suffered.  *Lawson v. United States*,

454 F. Supp. 2d 373, 416 (D. Md. 2006); *Suburban Hosp. Ass'n v. Mewhinney*, 230 Md. 480,

484-85, 187 A.2d 671, 673 (1963).  "The rule as to the degree of skill required . . . 'is not the

highest or greatest, but only such as is ordinarily exercised by others in the profession generally.'" *Lane v. Calvert*, 215 Md. 457, 462, 138 A.2d 902, 905 (1958) (quoting *Dashiell v. Griffith*, 84 Md. 363, 380, 35 A. 1094, 1096 (1896).

Ms. Hebert presents no expert testimony regarding the standard of care as to a physician. She thus fails to prove the first element of her claim (and in turn the second element) and thus cannot prove medical malpractice by a BVAMC physician.  The Court nonetheless will proceed with its analysis of this claim.

The United States' expert witness, Frederick Levy, M.D., an Attending Physician in the Department of Emergency Medicine at John Hopkins Hospital in Baltimore, Maryland as well as an Assistant Professor in Emergency Medicine at the John Hopkins School of Medicine, reviewed the Complaint, Ms. Hebert's medical records and the expert report prepared by Ms. Hebert's expert, Cecilia Fox, RN, CLNC.  Dr. Levy notes the absence of any mention of Ms. Hebert having difficulty breathing *before* her discharge on July 20, 2004.  In reviewing the medical records Dr. Levy found five record entries concerning Ms. Hebert having difficulty breathing.  Two of the record entries state Ms. Hebert's difficulty began *prior to* her July 20, 2004 discharge.  The other three indicate Ms. Hebert's difficulty in breathing began *after* her July 20, 2004 discharge.  "All five record entries comment from the perspective of the history taken on the *readmission* of July 21, 2004 and represent the patient's complaint on July 21, 2004, not on July 20, 2004."  Dr. Levy's Sworn Rule 26(a)(2)(B) Expert Witness Report [Document No. 50] ("Dr. Levy's Sworn Report") ¶ 8.  Ms. Fox, Ms. Hebert's expert, does not provide an opinion about what happened *before* Ms. Hebert's readmission on July 21, 2004.  As to paragraphs 16 - 18 of the Complaint Ms. Hebert fails to prove a breach by BVAMC medical

staff.

Regarding the third element, injuries resulting from a breach of the standard of care, Ms.

Hebert speculates that her current, sporadic difficulty swallowing may be attributable to the

delay in treatment.

> Q:   Has any health care provider ever told you that your choking
> symptoms are because of the incident with the foreign body in your
> throat?
>
> A:  Well, I have discussed it with Dr. Santos, my primary.  He said
> it could, that could be the reason and it could not be the reason.
> That's why he needed to set me up with a specialist, which is the
> ENT clinic.

Def.'s Mem., Ex. 1 (Hebert Dep. 49:13 - 20).  Later, during the deposition, Ms. Hebert concedes

she has no proof that the delay in treatment caused her current swallowing difficulty.

> Q:   At this point, you don't really know if the alleged delay in
> treating and evaluating the foreign object in your throat caused the
> symptoms with the flap, right?
>
> A:  No, I do not know that at this time.

*Id.*, Ex. 1 (Hebert Dep. 54:15 - 19).  Ms. Hebert fails to prove her speculative injury was

proximately or directly caused by some breach of the standard of care by BVAMC personnel

resulting from a delay in proper evaluation of a foreign object in her throat.

Ms. Hebert also alleges medical malpractice stemming from a delay in treatment by

BVAMC personnel.  On July 21, 2004, less than 24 hours after being discharged on July 20,

2004, Ms. Hebert returned to BVAMC's emergency department and reported difficulty breathing

due to a sensation that something is caught in her throat.  According to Ms. Fox, Ms. Hebert's

expert, the nurses in the emergency department violated the standard of care "by failing to assess

Ms. Hebert's airway, breathing and circulation on that day."  *Id.*, Ex. 5 (Fox Dep. 38:13 - 15).

Ms. Fox bases her opinion on a triage note.  Ms. Fox notes the absence of vital signs, pulse

oxygen (a measurement for breathing) and lung sounds.  *Id.*, Ex. 5 (Fox Dep. 38:17 - 20).

Ms. Fox also opines there was a violation of the standard of care when Ms. Hebert was

allowed to walk around with a foreign object lodged in her throat.

> Q:  I believe you testified something about somebody being walked.
> What did you mean by that?
>
> A:    My understanding is that Ms. Herbert [sic] was seen by, I
> believe, a resident who used a portable scope and saw something
> lodged and she was taken to the clinic.
>
> Q:  What did you mean by "she was walked"?  Does that have
> something to do with your expert opinion that the standard of care
> was breached?
>
> A:  If a person has an object lodged in their throat, walking them
> could dislodge it.
>
> Q:  Okay.  And is there any factual or scientific evidence to support
> your opinion that walking a patient could dislodge an object in
> somebody's throat?
>
> A:  I don't know any specific.
>
> Q:  Have you in your experience as a nurse ever seen, heard or read
> of a patient having an object in their throat dislodge from walking?
>
> A:  Sudden movement can.
>
> Q:   Right.  I guess my question was about whether you, in your
> experience, have ever seen, heard or read of that happening.
>
> A:  I can't say that I have.
>
> Q:   Is it your expert opinion that there's some sort of violation of
> hospital procedures as a result of Ms. Herbert [sic] walking?  And if
> so, are you an expert in hospital procedures at the VA?
>
> A:  Not at the VA.

Q:   Okay.   Is it your expert opinion that there was a hospital procedure violated by Ms. Herbert [sic] walking in this instance?

A:   I don't know specifically that there is.

*Id.*, Ex. 5 (Fox Dep. 42:7 - 43:13).

As to the third element of a medical malpractice claim, Ms. Hebert presents no evidence showing the violations of the standard of care, specifically (a) not assessing Ms. Hebert's airway, breathing and circulation and (b) permitting Ms. Hebert to walk around with an object lodged in her throat, directly caused injuries, *i.e.,* a delay in treatment.   A further review of the alleged breaches of the standard of care are warranted.

Ms. Fox contends the standard of care when a patient reports difficulty breathing is to assess the airway, breathing and circulation.   In reviewing the medical records, contrary to Ms. Fox's testimony, the Court finds vital signs (listing temperature, pulse, respirations, blood pressure and pulse oxygen) recorded on the triage note of July 21, 2004 at 1704 hours by Gretel R. Ramsay, R.N.   *See id.*, Ex. 10 at 164-65.   Ms. Hebert was questioned about her level of pain which she rated as a 10 out of 10.   This information is also recorded on the triage note.   Nurse Ramsay characterized the disposition as "acute."

It is unclear to the Court what the protocol is for documenting when a nurse assesses a patient's airway, breathing and circulation.   Nurse Ramsay may have assessed Ms. Hebert's airway, breathing and circulation and omitted to record the findings or the VA may not mandate such items be recorded.   Even if the Court presumes the absence of this information means Nurse Ramsay breached the standard of care, Ms. Hebert, through her expert witness Ms. Fox, fails to show how the breach directly caused injuries to Ms. Hebert.

Ms. Fox also opines a violation of the standard of care occurred by allowing Ms. Hebert

24

to walk with a foreign object lodged in her throat.  It is undisputed that the individual directing

Ms. Hebert to follow him by walking is a medical resident, *i.e.,* a doctor.  No nurse was involved

in directing or ordering Ms. Hebert to walk.  Ms. Fox therefore is not qualified to testify whether

the ENT medical resident breached the standard of care, a fact she acknowledged during her

deposition.

> Q:   What is a legal nurse consultant?
>
> A:   A legal nurse consultant is a nurse who's experienced in nursing, takes a curriculum.  There are exams, certifications that can be taken, which I have taken . . . to become a certified legal nurse consultant.  We review medical malpractice, personal injury cases for merit to see if the standards were deviated from.
>
> Q:   Nursing standards or – –
>
> A:   Nursing standards, medical standards strictly as consulting.  We don't testify on physicians.  We can only testify to our expertise in nursing.

*Id.*, Ex. 5 (Fox Dep. 9:14 - 24).  The Court thus disregards Ms. Fox's "expert opinion"

concerning a breach of the standard of care by a physician.

The United States' expert, Dr. Levy, addresses this alleged breach of the standard of care

in his sworn expert report.

> There is nothing in the record to support the notion that the patient was, in any way, harmed by any alleged violation of hospital procedure.  On page 4 of her report, plaintiff's expert comments, ". . . having the patient walk down stairs and long distances with the foreign body could have dislodged and caused a complete airway obstruction."  I do not believe that there is any factual or scientific evidence to support her opinion and furthermore, in my 18 years of practice as an Emergency Medicine physician, I have never seen, heard or read of this possibility.

Dr. Levy's Sworn Report ¶ 14.

Having failed to prove the first two elements for a medical malpractice claim, Ms. Hebert is unable to prove the third element.  Ms. Hebert fails to prove by a preponderance of the evidence medical malpractice by BVAMC personnel due to a delay in treatment.  In conclusion Ms. Hebert is unable to demonstrate medical malpractice by BVAMC personnel with regard to either a delay in proper evaluation or a delay in treatment of the foreign object in her throat.

C.      Battery

A battery is an intentional touching of a person without the person's consent.  "[A] purely accidental touching, or one caused by mere inadvertence, is not enough to establish the intent requirement for battery."  *Nelson v. Carroll*, 355 Md. 593, 602, 735 A.2d 1096, 1100 (1999).  To constitute a battery, the touching must be harmful or offensive.  *Id.* at 601, 735 A.2d at 1100.

The United States argues that Ms. Hebert's cause of action for the administration of allergic-inducing medication is essentially a claim grounded in the lack of informed consent.  Such a claim is an assertion of negligence, not battery, under Maryland law.  The Court concurs.  *See Mole v. Jutton*, 381 Md. 27, 846 A.2d 1035 (2004).  The Court will thus analyze this "battery" claim as a negligence cause of action, and since this assertion is against BVAMC medical staff, the appropriate cause of action is medical malpractice.

Ms. Hebert asserts Dr. Robottom negligently prescribed and a nurse negligently administered morphine via an IV line on July 21, 2004.  *See* Def.'s Mem., Ex. 10 at 157-58.  Ms. Hebert claims she was wearing an allergy bracelet shortly after admission listing her allergies including morphine.  The Court notes, prior to the July 21, 2004 admission, Ms. Hebert's medical records at times lists morphine under allergies and at other times *excludes* morphine under allergies.  *Compare id.*, Ex. 2 at 17, 37, 142 *with id.*, Ex. 2 at 12, 39, 44.  It is undisputed

that morphine was administered and Ms. Hebert had an allergic reaction.  Benadryl was then

administered to counter the allergic response.  The United States concedes, despite an allergy to

morphine documented in medical records, a doctor ordered morphine to treat Ms. Hebert's

abdominal pain.  *Id.* at 26.

The decision to prescribe morphine was made by the doctor, not the nurse.  Ms. Hebert

has not presented any expert testimony establishing the standard of care for a medical resident

such as Dr. Robottom, the breach of this standard of care, that the breach directly caused injuries

and the nature of the damages suffered by Ms. Hebert.

As to the conduct of the nurse, Ms. Hebert's expert witness, Ms. Fox, opines the nurse

breached the standard of care.

> Q:  So your testimony is, yes, the standard of care was breached with
> respect to this Morphine administration?
>
> A:  Yes.
>
> Q:  Okay.  Who breached the standard of care?
>
> A:  The nurse didn't identify the patient or check the allergy.
>
>           \*               \*               \*
>
> Q:  On what do you base your expert opinion that a nurse breached
> the standard of care with respect to administering Morphine?
>
> A:  If the nurse had properly identified the patient and asked about
> allergies prior to giving any medication, then she would have been
> informed and would've seen that the patient was allergic to
> Morphine.

*Id.*, Ex. 5 (Fox Dep. 44:3 - 8, 14 - 20).

Ms. Hebert has established the standard of care, the breach of that care and that the

breach of the standard of care by the nurse directly resulted in injuries, *i.e.*, breaking out in hives.

It is undisputed, once Ms. Hebert informed the nurse of her allergy, the nurse administered benadryl to counteract Ms. Hebert's allergic reaction.  The benadryl had the desired effect.

> Q:    And it's your understanding, isn't it, that Benadryl was successful in treating the hives and making them go away, correct?
>
> A:  Yes.

*Id.*, Ex. 5 (Fox Dep. 48:13 - 16).

Although morphine was improperly administered to Ms. Hebert, she suffered no permanent injury.

> Q:  And is it your understanding that Ms. Herbert [sic] suffered any damages or injuries as a result of the outbreak of hives?
>
> A:  No permanent damages.
>
>    *      *      *
>
> Q:  And hives aren't harmful, are they?
>
> A:  I'm sorry.
>
> Q:  Hives are not harmful, are they, hives?
>
> A:   They're the sign of a reaction that could advance and cause a patient – –
>
> Q:  But hives themselves – –
>
> A:  Hives themselves?
>
> Q:    Assuming there's no further sequela, are hives themselves harmful?
>
> A:  No.

*Id.*, Ex. 5 (Fox Dep. 46:23 - 47:1, 24 - 48:8).

Any negligence claim, including a medical malpractice claim, requires a plaintiff to

prove damages.  Ms. Hebert is unable to prove any damages resulting from the improper administration of morphine.  As Dr. Levy observed in his sworn report, "[w]hile it is true the patient was given morphine despite her allergy, the response to the outbreak of hives was appropriate and within the standard of care.  There were no lasting effects to the transient episode of hives that the patient suffered."  Dr. Levy's Sworn Report ¶ 18.  Ms. Hebert has failed to prove her second cause of action.

> D.      Negligence: Failure to Inform Ms. Hebert of Positive Hepatitis C Results

Ms. Hebert claims a BVAMC doctor[15] was negligent by failing to notify her, in a timely fashion, that she tested positive for Hepatitis C.  In other words, a doctor owed a duty to Ms. Hebert, *i.e.*, informing her of the positive test result, the doctor breached that duty, and the breach of the duty directly caused injuries to Ms. Hebert.

It is undisputed that during Ms. Hebert's hospitalization from October 11-15, 2004, a Hepatitis C test was ordered and the results were still pending when Ms. Hebert was discharged on October 15, 2004.  *See* Def.'s Mem., Ex. 9 at 218, 260.  Second, the medical records show Ms. Hebert's Hepatitis C results were known at least as early as November 9, 2004.  *See id.*, Ex. 8 at 509.  Notably Ms. Hebert had a medical appointment with the Primary Care Clinic on November 9, 2004 but failed to appear for her appointment.  *Id.*, Ex. 7 at 1.  Three subsequent appointments with the Primary Care Clinic were scheduled for December 6, 13 and 27, 2004 but the Primary Care Clinic canceled two of the appointments and Ms. Hebert canceled the other

---

[15] Q:  So, who is it that you allege was negligent in not informing you of your hepatitis C results?

A:  The doctor who obviously ordered the test, which I don't know the name of.

Def.'s Mem., Ex. 1 (Hebert Dep. 74:12 - 15).

one. *Id.* The medical records indicate Ms. Hebert was first notified of her positive Hepatitis C

results during an unscheduled appointment with the Primary Care Clinic on February 7, 2005.

*See id.*, Ex. 7 at 1; Ex. 8 at 508.

Ms. Hebert's allegation of negligent failure to inform patient of positive Hepatitis C

results is against doctors not nurses. Ms. Hebert's expert, Ms. Fox, is qualified to provide expert

testimony concerning nurses only.

> Q:  Ms. Fox, is it your expert opinion that any nurses breached the
> standard of care with respect to results of a Hepatitis C test?
>
> A:  Not nursing.
>
> Q:  Okay. So your response is no, correct?
>
> A:   No, that's correct.

*Id.*, Ex. 5 (Fox Dep. 49:12 - 17).

As noted previously, a presumption exists that a doctor performs his medical duties with

requisite skill and care. *Nolan v. Dillon*, 261 Md. 516, 534, 276 A.2d 36, 46 (1971) (citing *State,*

*Use of Janney v. Housekeeper*, 70 Md. 161, 16 A. 382 (1889); *Fink v. Steele*, 166 Md. 354, 171

A. 49 (1934); *McCless v. Cohen*, 158 Md. 60, 148 A. 124 (1930)).  Ms. Hebert presents no

expert testimony regarding the standard of care as to a physician. She thus fails to prove the first

element of her claim (and in turn the second element) and thus cannot prove medical malpractice

by a physician at BVAMC. The Court nonetheless will proceed with its analysis of this claim.

Ms. Hebert is unable to establish the third element because she has not proven how any

alleged breach directly injured her. In her Complaint Ms. Hebert contends the delay in

notification about her positive Hepatitis C results "caused a delay in seeking the appropriate

evaluation and treatment for this disease." Compl. ¶ 41. This assertion is contradicted by her

deposition testimony.

> Q: What treatment did you undergo for hepatitis C?
>
> A: Nothing. They can't treat the hepatitis C at this time, because the medicine they give me for hepatitis C will exacerbate the Crohn's.

Def.'s Mem., Ex. 1 (Hebert Dep. 72:16 - 20). The United States' expert, Dr. Levy, finds Ms. Hebert suffered no harm. "The record is unclear with respect to the exact timing of the test result confirmation and notification. What is clear from the record is that the patient suffered no discernable harm from the alleged delay in notification." Dr. Levy's Sworn Report ¶ 20. Ms. Hebert has thus failed to prove her claim.

### E.    Undue Mental Anguish for Failure to Inform or Address Complaints

Ms. Hebert recounts a number of instances in support of this claim but the Court will address two: (a) the insertion of a nasogastric tube without a lubricant or numbing agent and (b) discomfort from an IV placement and the development of an infection from the femoral line in the groin area due to the failure of medical staff to change the femoral triple lumen dressing. Under Maryland law to prevail on a claim of undue mental anguish, Ms. Hebert must demonstrate that (a) the conduct of BVAMC medical staff was intentional or reckless, (b) the conduct of BVAMC medical staff was extreme and outrageous, (c) the conduct of BVAMC medical staff caused Ms. Hebert emotional distress and (d) the emotional distress was severe. *Harris v. Jones*, 281 Md. 560, 380 A.2d 611 (1977).

#### 1. Insertion of Nasogastric Tube

This incident occurred during Ms. Hebert's visit to the emergency department on August 23, 2004. Ms. Fox, Ms. Hebert's expert, first stated there was no breach of the standard of care regarding the insertion of the nasogastric tube. *See* Def.'s Mem., Ex. 5 (Fox Dep. 62:9 - 15).

Upon further inquiry however Ms. Fox declared a breach of the standard of care occurred.

> Q:  So is it your expert opinion that a nurse breached the standard of care with regard to placing an NG tube in Ms. Herbert [sic]?

> A:  Yes, if this is what happened.

> Q:  Okay.  Is your statement that a breach in the standard of care occurred based on what Ms. Herbert [sic] told you?  And if so, is your opinion different if you just look at what's based in the records – – at what the records reflect?

> Why are you revising your earlier testimony that the standard of care was not breached?

> A:  I hadn't read this and not remembering what transpired.  In the notes there's a statement, "Unable to pass the NG tube," and that it was placed by a physician and that she had sustained a nose bleed from that.

> Q:  Have you ever placed an NG tube?

> A:  Many.

> Q:  Okay.  So is it your understanding that insertion of an NG tube without anesthesia is outside the standard of care?

> A:  Not without anesthesia.  There are topical solutions that can be used, but – –

> Q:  Okay.  But you're not testifying that inserting an NG tube without anesthesia is outside the standard of care?

> A:  Right.

> Q:  That's not your testimony?

> A:  (Nods head.)

> Q:  So what is your testimony with regard to why the standard of care was breached?

> A:  If, in fact, lubricant was not used, that is a standard.  It's difficult to pass a tube.  It is part of the procedure in passing the tube.

Q:   Oh, I see.   So we're talking about lubricant as opposed to anesthesia?

A:   Yes.

Q:   Okay.   So it's your testimony that the absence of lubricant in placing an NG tube is not within the standard – – that not using a lubricant is outside the standard of care with regard to placement of an NG tube?

A:   Yes.

Q:   Okay.   But not anesthesia.   Insertion of an NG tube without anesthesia is within the standard of care, right?

A:   Yes.

Q:   Okay.   And on what do you base your conclusion that the tube was inserted without lubrication?

A:   This would have to be based on what Ms. Herbert [sic] said.

Q:   And there's nothing in the record saying it was performed without lubricant?

A:   There's nothing in the records from the nurse of it being placed, of difficulty or of the nose bleed.

Q:   And was it placed by a nurse or a doctor?

A:   Eventually it was placed by a physician.   The physician stated, "Nurses were unsuccessful."

Q:   And is it your understanding that Ms. Herbert [sic] suffered any injuries or damages as a result of the placement of the NG tube?

A:   No permanent.

Q:   Well, is it your testimony that she suffered transient damages?

A:   The nose bleed and the discomfort.

Q: Okay.  Are nose bleeds and discomfort recognized complications of NG tube insertion?

A:   They can be.

*Id.*, Ex. 5 (Fox Dep. 64:23 - 67:12).

Although Ms. Hebert characterizes this claim as "undue mental anguish," the Court agrees with the United States that Ms. Hebert appears to allege medical malpractice.  The Court will thus consider this a medical malpractice allegation.

The United States' expert, Dr. Levy, concurs with Ms. Fox that the standard of care does not mandate the use of anesthesia when inserting an NG tube.

> Insertion of a NGT without anesthetic is within the standard of care. Use of anesthetic finds no support in the evidence based scientific literature and in my experience, has not proven to be helpful, because it is difficult if not impossible to adequately anesthetize this area of the nose and throat with respect to inserting a large plastic tube. While providers would like to make the patient comfortable whenever possible, they must often balance the risk with the benefit in deciding on whether or not to perform a procedure.

Dr. Levy's Sworn Report ¶ 25.

Dr. Levy does not address whether applying a lubricant is within the standard of care. The Court notes there is no mention of applying a lubricant before the insertion of the NG tube in the medical records.  *See* Def.'s Mem., Ex. 13.  The only "evidence" regarding the nurse's failure to apply a lubricant before inserting the NG tube is Ms. Hebert's deposition testimony. *See id.*, Ex. 1 (Hebert Dep. 86:16 - 87:1).

Even presuming applying a lubricant is within the standard of care, and even presuming the nurse breached this standard of care by not applying the lubricant before inserting the NG tube, Ms. Hebert's claim nonetheless is unsupportable because Ms. Hebert fails to prove damages.  Ms. Hebert's own expert, Ms. Fox, testified Ms. Hebert suffered no permanent damage.  Moreover the transient injuries, a nose bleed and accompanying discomfort, are

recognized complications.  Ms. Hebert therefore fails to prove by a preponderance of the evidence medical malpractice.

> ### 2.   *Infection Resulting from Failure to Change Dressing of Femoral Line*

It is undisputed, as acknowledged even by Ms. Fox, that Ms. Hebert did not suffer an infection.

> Q:    And is it your expert opinion that there was some injury or damage caused to Ms. Herbert [sic] as a result of the alleged breach in the standard of care with regard to the nurse's site assessment?
>
> A:   She had came [sic] back in with an infection.  They stated that they were looking at her right groin.
>
> Q:   Who states they were looking at her right groin?
>
> A:   She returned at one point with fever, and this was post – – after the admission she had been in where she had a right femoral line placed.
>
> Q:    Okay.  So it's your testimony that she came back with an infection at this site, the femoral line site?
>
> A:  Yes.
>
> Q:  Okay.  And on what do you conclude that she came back with an infection at the site?
>
> A:  From the physicians' notes, the progress notes of the physicians.
>
>            *                     *                     *
>
> Q:   And so isn't it true that clinically the record states that there was tenderness in her groin but no evidence of erythema or fluctuance, which are both markers of infection?
>
>            *                     *                     *
>
> Q:    So it's possible, but there's no confirmation of finding an infection anywhere in the record, is there?

*                    *                    *

Q:   But, Ms. Fox, respectfully, it sounds like you concluded that there was an infection that this woman suffered without there being any documentation confirming that there was an infection.  I understand that physicians are contemplating the possibility of an infection.

*                    *                    *

Q:   There's no evidence confirming that she had an infection.  Isn't it true that she – – that her blood cultures were all negative, that the CT scan did not show any abscess, that there was no evidence of erythema or fluctuance and that the CT scan did not demonstrate an infection and the blood cultures remained negative throughout her hospital course?

A:   Yes.

Q:   So then on what basis are you concluding that she suffered an infection?  Can you conclude, given those factors, that she did, in fact, suffer an infection?

A:   She had an infection.  They never – – I'm trying to remember if I – – I have to go back to remember this.  I'd have to say no.  From what was in here with elevated white blood cell count, with fever – – but to pinpoint exactly where the infection was, I'd have to say there's nothing specific.

Q:   But don't you have to say that there's no evidence that she actually suffered an infection?  I understand that you're trying to rule out an infection, but the record – – I mean, we've talked all day about how, you know, if it's not – – about the importance of it being in the record, and I just don't see where in the record it shows that there's evidence of infection at the site.

A:   I have to agree with you.  I'm sorry.

*Id.*, Ex. 5 (Fox Dep. 57:12 - 58:3, 19 - 22, 59:14 - 16, 20 - 25, 60:12 - 61:11).

In the Court's review of the medical records *supra*, there is no documentation of an infection.  Dr. Levy reviewed Ms. Hebert's medical records and reached the same conclusion.

> Although infection at the insertion site is a recognized complication
> of this [femoral line] procedure, there is no evidence of infection at
> that site. CT scan did not demonstrate an infection and blood cultures
> remained negative through the patient's hospital course.   No
> subsequent hospitalizations indicate that this was or ever became an
> issue.

Dr. Levy's Sworn Report ¶ 22.

Ms. Fox opines however that actions by BVAMC nurses with regard to femoral line

dressing breached the standard of care.

> Q:   And then, Ms. Fox, is it your opinion that the standard of care
> was breached by any nurses with respect to the insertion of a femoral
> line in September of 2004?
>
> A:   Not with the insertion
>
> Q:   Okay.  What is your opinion with regard to that incident?
>
> A:   In the nursing records that I reviewed, I find no mention of
> dressing changes based on the standards for IV therapy and central
> line dressings.  There is a national standard for them being changed.
>
>         *                        *                        *
>
> Q:   Okay.  And so it's your opinion that the standard of care was
> breached by nurses by not properly changing the dressing?
>
> A:   When I reviewed the nursing notes, the daily shift notes, there's
> no mention of dressing being changed within a certain time frame,
> which is maximum 72 hours.
>
>         *                    *                    *
>
> Q:   Okay.  So other than the absence of a record of dressing changes,
> on what else do you base your expert opinion that nurses breached
> the standard of care by not properly changing the dressings?
>
> A:   The dates – – if you look at the dates on the daily shift note, it
> goes well past 72 hours and they say dressing date or insertion date.
>
> Q:   What goes past 72 hours?

A:  The time frame from when they say they flushed it, it's flushing well.

              *                    *                    *

A:   But just because the line flushes, the site should be assessed. That's a standard of patient care.

Q:  Okay.  So in what aspect was the standard of care breached?

A:  Failure to assess the site completely.

Q:  And how do you know the site was not assessed?

A:  I can only ascertain from the records that I received.  There's no mention in this assessment unless, as I said, there were records missing, if they have a sheet that they check off for assessing the IV site for redness, the dressing is dry and intact.

              *                    *                    *

Q:  Isn't it true that it's possible that she could have just done it and not documented?

A:   It's true that it's possible, but it's still breaching the standard. It's a failure to completely document.

Q:   Is it the standard of care or the standard of documenting?  I mean, I understand what you're saying.

A:  In order to decide if a standard of care was met, you would need to have that information, documenting as well as assessing.

Q:   And is it your expert opinion that there was some injury or damage caused to Ms. Herbert [sic] as a result of the alleged breach in the standard of care with regard to the nurse's site assessment?

A:   She had came [sic] back in with an infection.  They stated that they were looking at her right groin.

*Id.*, Ex. 5 (Fox Dep. 49:18 - 50:2, 18 - 23, 51:4 - 13, 55:8 - 18, 57:2 - 17).

Although Ms. Hebert alleges "undue mental anguish," this allegation is more properly

characterized as medical malpractice and the Court will thus analyze this claim as such.  Even if Ms. Fox's testimony is accurate that BVAMC nurses breached the standard of care by not changing the dressing of a femoral line within a specified period of time, Ms. Hebert fails to prove her claim because she did not suffer an injury directly attributable to the alleged breach. Both Ms. Fox and Dr. Levy concur that Ms. Hebert never developed an infection.

## **CONCLUSION**

For the foregoing reasons the Court finds there are no genuine issues as to any material fact and thus the United States is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). An Order will be entered separately.


  October 30, 2009                                /s/                           
        Date                                  WILLIAM CONNELLY
                                  UNITED STATES MAGISTRATE JUDGE